## The TEXAS AND PACIFIC RAILWAY COMPANY, Appellant,

v.

## Madge Reed WATKINS, Individually and as Natural Tutrix of her Minor Child, Richard Wesley Watkins, Appellee.

### No. 16294.

United States Court of Appeals
Fifth Circuit.

April 12, 1957.

Rehearing Denied June 14, 1957.

J. Barnwell Phelps, New Orleans, La., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant-appellant.

C. William Bradley, Norco, La., Thompson L. Clarke, St. Joseph, La., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

As though almost at hand were the day of the juridical Univac, in which data on weather, distance, speed, time, maxima-minima variables, favorable and unfavorable inferences are fed into its insatiable maw there to be stored, sorted, weighted, compared and digested, the Railroad with great earnestness insists that mechanically there can be no liability for the crossing death of Opal Watkins because the tractor hit the train, not the train hit the tractor. The jury with its cruder abacus delivered a contrary result.

The accident took place in the early morning hours at the crossing of a private road over the railroad track as it runs east and west through the Green & Gold Plantation for whom Watkins worked. The passenger liner was eastbound, and Watkins, on the north side of the track, was driving a large, cumbersome diesel tractor pulling an implement on or adjacent to the crossing road in the course of going to the plantation fields south of the track. There was, to the Railroad's knowledge, a considerable movement of employees and heavy farm equipment over this crossing every morning and during the day. While both were in motion the tractor, somewhere near its front end, collided with some part of the train on the north side of the crossing killing Watkins immediately.

Testing this, as we must with all inferences most favorable to the jury verdict, there was ample, believable evidence which the jury could and presumably did credit as to other circumstances. There was heavy fog reducing visibility to a range between 50 and 100 feet, and the noise of the large, heavy duty diesel tractor was sufficient to offset or drown out the rumbling noise of an oncoming train. The angle is disputed, but the tractor's course ranged toward the southeast so that train and tractor were converging with the train approaching behind Watkins' back. This crack passenger train, running 10 minutes late, was making 65 miles per hour or approximately 96

feet per second. The whistle for this private, but known, crossing was not blown until after the impact and when the engine was right on, or just beyond, the crossing. And in the lookout maintained by him, the engineer never saw the tractor, although a wide view of the right of way and crossing road was unobstructed and, on any of the Railroad's theoretical hypothesis, the tractor was not farther than 20 to 30 feet from the track as the train approached and went through the crossing.

This, with evidence that the plantation operators had for some time warned the Railroad's management of dangers of this crossing as this daily movement of slow, awkward, unmanageable farm equipment made its daily trek to and from the work fields frequently in fog and other circumstances of reduced visibility, was sufficient to allow the jury to conclude that, under applicable Louisiana principles,[1] the Railroad had failed to exercise due care by earlier blowing effective warning signals, reducing speed, increasing vigil, or the like, because of the special hazards and dangers of that crossing under those known conditions.

Notwithstanding this ample basis for the jury's verdict, the Railroad insists that evidence otherwise favorable to the plaintiffs demonstrates either that the train was so far through the crossing that the decedent must simply have run into the side of an obvious, moving train, or, in any case, if the initial impact were near the front of the train, the tractor driver had time and distance within which to act, and his failure compels a finding of contributory negligence as a matter of law.[2]

While the evidence from photographs and car repairmen was impressive and the jury might have concluded that the initial impact was at the first point of serious damage to the third car (approximately 300 feet from the front end), this conclusion was not compelled. The construction of the tractor, the light damage to its left front wheel, radiator shell and fan blade was sufficient to permit the jury to conclude that the initial impact was nearer the front of the train and, with the weird imponderables[3] of accidents, this whipped the tractor around throwing it forceably against the car's side as it sped by.

This narrows the Railroad's attack then to inferences of time, distance and opportunity which it claims are compelled by the witness Tastet's testimony.[4] But this intricate analysis[5] with its fine

1. Kansas City Southern Ry. Co. v. Wiggins, 5 Cir., 234 F.2d 128, 131.

  Guidry v. Texas & N. O. Ry. Co., La. App., 20 So.2d 637, 638, see second appeal, La.App., 56 So.2d 611, approved, from 22 Ruling Case Law, Railroad, § 233, p. 1004, 1005:

  " * * * A railroad is bound to exercise reasonable care in the operation of its trains and to avoid injury to persons and animals at all crossings, private as well as public; and if by reason of peculiar or extraordinary circumstances surrounding a crossing and known to the trainman, prudence would require an alarm or signal to be given by an approaching train, then its omission is negligence."

2. See, e. g., United States Fidelity & Guaranty Co. v. McCullough, 5 Cir., 202 F.2d 269, certiorari denied 346 U.S. 868, 74 S.Ct. 108, 98 L.Ed. 378; Wyche v. Brian, La.App., 28 So.2d 143; Illinois Central Railroad Co. v. Leichner, 5 Cir., 19 F.2d 118.

3. A glass water jug hanging in the cab of the tractor was undamaged.

4. Tastet was in a truck south of the track turning from a side road into the crossing road. He had a full, but momentary, view of the track, train and tractor. When the engine entered the crossing it cut off his view of the tractor. In the moment preceding that, he saw the train come out of the fog when it was 75 to 100 feet from the crossing at which time the tractor, apparently at some angle, was 15 to 20 feet from the crossing. The train and tractor kept coming on and in an instant collision occurred.

  He estimated the tractor's speed at 8 to 10 miles per hour (11.7 and 14.66 feet per second, respectively) and stopping distance at this speed at 8 to 10 feet for a planned stop but "a sudden stop would even be a little bit further * * *."

5. Reading into Tastet's estimated distance of "15 to 20 feet" the assumption that

calculations, some of which are based on assumptions which the jury did not have to make even if its reasoning process took this form, fails to reckon with several things of importance. The first is that the necessity for sudden action in these fleeting moments was precipitated by the train's failure earlier to blow an audible warning signal and repeat it if necessary as the engine broke through the fog and could see, had lookout been kept, the tractor on its apparent course toward destruction. Whether with fog obscuring the track beyond 75 feet he ought to have anticipated that a train would suddenly emerge without warning, whether with fifteen feet and one second then between him and eternity Watkins ought to have stopped and had he, whether with time and distance for response and subsequent braking action, he could have stopped, whether he should have

the distance, 15 or 20, was the perpendicular, north and south, from the front end of the tractor to the nearer, north, rail the Railroad on the further assumption that the tractor was approaching at a 45 degree angle constructs two right angle triangles which produce an hypotenuse of 21.2 feet and 28.5 feet, respectively.

The nature of the reasoning which the Railroad insists "reasonable men" are compelled to follow, and the choices open to Watkins as his life reached its close, is then elaborated on in the Railroad's brief:

"If the tractor was 15 feet from and approaching the track at a 45° angle, * * * it would have to travel 21.2 feet to reach the crossing * * * The train being 75 feet away when it came out of the fog and travelling in excess of 65 miles per hour (therefore travelling more than 95.4 feet per second) and decedent being 15 feet away from the track travelling at the rate of 10 miles per hour (14.66 feet per second) it would take the train one second to be more than 20.4 feet past the crossing, at which time the tractor would still be 6.54 feet from the crossing. It would take the tractor 9/20ths of one second to travel the remaining 6.54 feet, during which time the train would have travelled more than 45.9 feet, or a total of more than 66.3 feet past the crossing. For every mile per hour the train exceeded 65 miles per hour, the train would travel approximately 2 feet more for the one and nine-twentieths of a second it would take the tractor to reach the crossing. If the tractor was 20 feet from the track, it would have to travel 28.5 feet to reach the crossing * * * and travelling at 8 miles per hour (11.7 feet per second) and the train 75 feet from the crossing, travelling in excess of 65 miles per hour, it would take the tractor 2.436 seconds to reach the crossing. In these 2.436 seconds, the train would have travelled 232.39 feet, less the 75 feet it was from the crossing, or the train

[engine] would be 157.39 feet past the crossing. For every mile per hour the train exceeded 65 miles per hour, the train travelled 3.56 feet for the 2.436 seconds it took for the tractor to reach the crossing."

On assumption that the tractor was 15 feet, the train 100 feet from crossing, with tractor moving at 10 miles per hour:

"The tractor 15 feet away from the track would have to travel 21.2 feet to reach the crossing, which would take 1.45 seconds. During this time, the train [engine] would have travelled 141.3 feet and would therefore be more than 41 feet past the crossing."

On assumption that the tractor was 20 feet, the train 75 feet from the crossing, with tractor moving at 8 miles per hour:

"Using these figures, the tractor would take 2.436 seconds to reach the crossing, during which time the train [engine] would have travelled 232.39 feet and would therefore be 157.39 feet past the crossing when the impact occurred."

On Watkins' failure to take action:

"When the tractor was 15 feet from the track and approaching at a 45° angle, it would have to travel 21.2 feet to reach the crossing point * * * If Watkins had applied his brakes at that time, he could have stopped with an 11.2 foot clearance. If the tractor was 20 feet from the track, it would have to travel 28.5 feet to its point of crossing * * * and therefore Watkins could have stopped with an 18.5 foot clearance. Obviously, if the tractor was the slightest distance more than 10 feet from the crossing, the train could have passed in absolute safety. Yet the accident occurred.

" * * * Notwithstanding that, if Watkins had been alert and had seen the train when he should have, he merely had to make a 45 degree turn to the left and by placing his tractor parallel to the path of the train, the train could have passed in absolute safety. Yet, he neither stopped nor turned his vehicle."

turned to the left instead of the right was the very stuff of which the ordinary prudent man is compounded.

Appealing as is the illusion of certainty, Mississippi Valley Barge Line Co. v. Indian Towing Co., Inc., 5 Cir., 232 F. 2d 750, liability cannot be resolved by a mechanical formula which, with chicken-or-the-egg-inquiry, attempts to fix *who* hit *whom*. If the train suddenly, without notice, broke out of the fog so that its presence became known to Watkins as it came abreast his tractor then travelling the few remaining feet to the track, the train, in the time it takes to say the words [6] "one locomotive" would have moved 100 feet. And yet, on this hypothesis, the Railroad's action was not the less the cause merely by reason of the fact that the physical contact was from the tractor running into the train.[7] Nor does the standing train rule [8] afford an insulation from the jury verdict. The train was not standing. It was moving.[9] Indeed, it was moving at high speed and what appeared to be an open crossing to the tractor-driver within the sounding of a trump was suddenly occupied by a train which just as quickly went away. The rule is one of common sense, Atlantic Coast Line R. Co. v. Kammerer, 5 Cir., 239 F.2d 115, and it cannot be applied to establish contributory negligence as a matter of law when its assertion assumes, without more, what is really in question, that is, the decedent's knowledge that a train was there, Kansas City Southern Ry. Co. v. Wiggins, 5 Cir., 234 F.2d 128, 132.

Finally, the Railroad does not succeed in demonstrating that such palpable error has been made, such a manifest miscarriage of justice has occurred, for us to hold that the District Court abused its discretion in denying the motion for new trial because the verdict was wrong even though supported by some evidence. Commercial Credit Corporation v. Pepper, 5 Cir., 187 F.2d 71; Whiteman v. Pitrie, 5 Cir., 220 F.2d 914; Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498, 500.

Affirmed.

TUTTLE, Circuit Judge (dissenting).

I dissent. I think there was no proof of negligence on the part of the railroad that had any causal connection with the collision, on a private road, with a tractor whose driver crossed the track daily and who was under standing instructions from his employer to approach the track cautiously. Moreover the testimony of the only eyewitness completely ruled out any possibility that the tractor was struck by the locomotive.

I think the judgment should be reversed.

Rehearing denied; TUTTLE, Circuit Judge, dissenting.

6. A fairly reliable rough way to judge time in seconds.

7. An opposite situation is as readily supposed: a tractor is stationary or moving slowly a few feet from the crossing apparently indicating to the locomotive engineer that it will await the passing of the train when, too late in time and too close in distance, the tractor suddenly moves toward the track and the train hits it broadside. The tractor's action would be the cause even though the train hit the tractor. See, e. g., Brown v. Louisville & Nashville R. Co., 5 Cir., 234 F.2d 204.

8. United States Fidelity & Guaranty Co. v. McCullough, 5 Cir., 202 F.2d 269, certiorari denied 346 U.S. 868, 74 S.Ct. 108, 98 L.Ed. 378; Allen v. Texas & Pacific Ry. Co., 5 Cir., 195 F.2d 545; DeLoach v. Louisiana & Arkansas R. Co., 5 Cir., 210 F.2d 921; Domite v. Thompson, La.App., 9 So.2d 55; Ramsey v. Louisiana & Ark. Ry. Co., La.App., 70 So. 2d 171; Gates v. Arkansas & L. M. R. Co., La.App., 180 So. 835.

9. This disposes of the further asserted error that the Court should have given the Railroad's requested instruction: "A train across a highway constitutes a most impressive notice to drivers of motor vehicles that crossing is temporarily blocked."